IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MARTIN VOLPE,** | ) | **CIVIL ACTION NO.** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **PACE INDUSTRIES-AIRO DIVISION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# COMPLAINT

## I.   PRELIMINARY STATEMENT

By this action, Plaintiff, Martin Volpe, seeks wage loss and liquidated damages, costs, and attorneys' fees, as a result of being terminated by Defendant, Pace Industries-Airo Division, because of his age, in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623(a).

## II.   JURISDICTION

1. This Court has jurisdiction of this matter by virtue of 28 U.S.C. § 1331, in that this is a civil action wherein the matter in controversy arises under the laws of the United States.

2. Venue is proper in this judicial district under 28 U.S.C. § 1391(b), in that this is a civil action in which jurisdiction is not founded solely on diversity of citizenship, and the acts constituting a substantial part of the events and omissions giving rise to the claims occurred in the Western District of Pennsylvania.

    3.    On May 20, 2019, Plaintiff filed a Charge of Discrimination with the EEOC against the Defendant, alleging age discrimination as the cause of his termination. On September 17, 2019, the EEOC issued a Notice of Right to Sue.[1]

### III.    PARTIES

    4.    Martin Volpe is an adult who resides at 577 State Route 217, Latrobe, PA 15650. At the time of the incident complained of in this lawsuit and presently, he was and is a citizen of the Commonwealth of Pennsylvania and the United States of America.

    5.    Pace Industries owns and operates the Airo Division, an aluminum die cast product manufacturer, with its principal place of business located at 1004 Industrial Boulevard, Loyalhanna, PA 15661.

### IV.    STATEMENT OF CLAIM

    6.    Volpe, currently age 63, was born on December 27, 1955.

    7.    He began working for Defendant in October 1993 as a General Machinist.

    8.    Volpe transitioned from that role to a quality control position. Following the quality control position, Volpe became a Facilitator (management position) in several of the Defendant's departments.

    9.    In October 2014, Volpe became a Facilitator for Defendant's CNC, General Finishing, and Finesse departments. In that role, he supervised the staff under him and the die cast product production occurring during his shift.

    10.    Volpe worked on Defendant's afternoon shift, with typical hours of 1:30 p.m. to 11:30 p.m.

---

[1] Plaintiff's Charge was dual filed with the PHRC. Once the administrative requirements have been exhausted, Plaintiff intends to amend this Complaint to include an additional count under the PHRA for age discrimination.

11. In 2014, Volpe applied for an open Facilitator position on Defendant's daylight shift. The daylight shifts were highly sought after given that the shifts ended at approximately 3:00 p.m.

12. Defendant hired Eric Mueseler for that daylight Facilitator position, passing over Volpe. Mueseler is approximately half Volpe's age and had no experience with die cast product production.

13. After the hiring of Mueseler, another daylight shift position opened up, and Volpe once again applied.

14. Defendant rejected Volpe in favor of Michael Ellis, an individual also half his age, with a fraction of his years of experience.

15. In approximately 2018, Crystal Frye began working under Volpe as a General Finisher in Defendant's Finesse department.

16. Throughout the time that Frye worked under Volpe, she had numerous performance issues that were documented by both Defendant's HR and Volpe.

17. Defendant's HR issued Frye a verbal warning, written warning, 3-day suspension, and 5-day suspension due to her attendance issues. Frye actually reached the end of Defendant's progressive discipline policy.

18. In addition to the discipline meted out by Defendant's HR, Volpe also verbally counseled Frye on her performance.

19. Frye's performance came to Volpe's attention because a number of her coworkers complained to him about how she habitually left early and returned late from her shift breaks. Volpe received complaints from Nick Crowel, Nick Colowsky, Gary Poole, Lyle Campbell, and Patricia Ray, among others.

20. When Volpe received complaints, he investigated them as his subordinates were his responsibility.

21. As part of his investigations, Volpe utilized the video cameras installed in the workplace to observe Frye's compliance with Defendant's break policies. Volpe was authorized to use the cameras in that manner and only used them sparingly as he had his own job to perform and could not spend hours watching Frye on camera.

22. Volpe discovered that the complainants were accurate, and he documented at least five instances where Frye violated Defendant's break policies.

23. In additional to Frye's abuse of break time, Frye took a meal break at an unapproved time. While it was not uncommon for Defendant's employees to snack while working, which was tolerated, Volpe received a complaint that Frye stopped working entirely in order to eat a meal. In investigating the complaint, Volpe located Frye and saw that she had in fact completely stopped working while eating.

24. As Volpe documented Frye's struggles, he verbally counseled her on several occasions with the goal of turning her performance around.

25. Volpe explained to Frye that he thought the quality of her work was excellent but her reliability was lacking. He offered her the opportunity to earn overtime if she wanted it, in order to motivate her. Volpe even told Frye about the cameras in Defendant's workplace as a courtesy so that she knew her actions could not be hidden from view.

26. During each of the verbal counseling sessions, Volpe always had a union representative present, typically Frank Gianotto, Jim Cole, or both. Frye was in a union position, and Volpe wanted to ensure complete transparency to protect against any allegations that his actions were anything but professional.

27. During Volpe's interactions with Frye, she never complained to him about his manner of supervision or treatment of her.

28. Despite Volpe's efforts, Frye's performance did not improve and she did not respond positively to his efforts.

29. On approximately November 24, 2018, Frye was scheduled work a Saturday shift. She did not show up for that shift and yet was not terminated despite being on the final step of Defendant's progressive discipline policy.

30. On November 30, 2018, Patrick Cooper, HR Manager at the time, asked to meet with Volpe in his office. Mary Kanji, HR Assistant, was present as well.

31. In this meeting, Volpe was informed by Cooper that Frye had complained about his treatment of her. Cooper then asked Volpe if he had a problem with Frye, and if he was "picking on her."

32. Volpe responded that he did not have a problem with Frye, thought she was a "hell" of a C&C Operator, and did not want her to be terminated.

33. Volpe also explained that he thought Frye's problems stemmed from the fact that she was unhappy in Defendant's Finesse department. Volpe described how Frye's change in attitude and performance forced him to limit their conversations, which once contained friendly banter, to purely business matters.

34. During this meeting, Volpe informed Cooper how he had documented Frye's infractions and could provide the records to Cooper.

35. Cooper refused the offer, claiming that the documents were not credible.

36. Volpe also explained his practice of having a witness present when disciplining Frye, and that he disciplined Frye because of her deficient performance and not because of a personal animus towards her or in an effort to single her out.

37. Cooper asked Volpe if Frye's coworkers would support his account. Volpe told Cooper that they would absolutely support him.

38. Throughout this meeting, Volpe remained calm and answered the questions asked of him. The meeting was short and cursory.

39. Following the meeting, Defendant transferred Frye to its midnight shift, removing Volpe as her supervisor. After the transfer, Volpe had no further interactions with Frye as she was no longer on his shift.

40. Volpe did not hear anything further regarding Frye's complaint until December 12, 2018.

41. On that date, Volpe was called into a meeting with Michael McDoniel, Division President, Cooper, and Vincent Battaglia, Operation Managers.

42. McDoniel informed Volpe that Defendant had terminated his employment because an investigation verified Frye's complaint. However, McDoniel offered Volpe the choice of resigning instead.

43. In his own defense, Volpe again denied any wrongdoing. He also offered to show McDoniel the records he maintained of Frye's violations, the same ones he offered to Cooper.

44. At the mention of the records, Cooper claimed ignorance, asserting that he had never heard of the records prior to that moment.

45. McDoniel was unmoved, and Volpe was forced to resign.

46. Following Volpe's termination, it became clear to him that Defendant never investigated Frye's complaint.

47. To Volpe's knowledge, Defendant never interviewed Frye's coworkers, including the union representatives who witnessed his discipline of Frye. This became evident after a

number of conversations with her coworkers.  Nor did Defendant allow Volpe the opportunity to fully address Frye's allegations.

48. Volpe also received a termination letter that claimed that his past performance, and Frye's complaint, were the reasons for his termination.  Performance was not mentioned in the termination meeting by McDoniel.

49. In the letter, Defendant cites a performance improvement plan ("PIP") that Volpe received in July 2017.  Defendant also claims that Volpe had been placed on another PIP prior to the one in 2017.

50. The July 2017 PIP was the first and only PIP that Volpe received.  Defendant's citation of a prior PIP is a pure fabrication.

51. In July 2017, a coworker complained about Volpe not providing him with the correct information that he needed for his shift.   That complaint was wholly inaccurate, and, coincidentally, that coworker was terminated just months after making that complaint.

52. After that complaint, Volpe was placed on the PIP.  Volpe did not contest the PIP and focused on the quality of his work.  According to the PIP, it would be completed on September 1, 2017.  Volpe heard no further mention of the PIP until it was referenced in his termination letter a year and a half later.

53. When analyzed, Defendant's reasons for Volpe's termination are clearly pretext for age discrimination.

54. Defendant denied Volpe better shifts in favor of younger, less qualified individuals, never investigated Frye's allegations, and changed the reasons for his termination (including fabricating a prior PIP).  Defendant then replaced Volpe with Rob Guzik, who was approximately 49 years old at the time—sufficiently younger.  Additionally, Defendant terminated Frye five days after Volpe's termination.

55. Defendant also retained Mueseler despite sexual harassment allegations being lodged against him. Mueseler was accused of sexually harassing a female employee but Defendant protected and retained him because he is half Volpe's age, whereas, Defendant terminated Volpe despite the meritless allegations against him.

56. Because of Defendant's actions, Volpe continues to suffer wage and benefit losses.

## V.   CLAIMS FOR RELIEF

### COUNT I – VIOLATION OF ADEA – TERMINATION

57. Plaintiff incorporates by reference the averments contained in all preceding paragraphs as if fully set forth herein.

58. Defendant has intentionally and willfully engaged in a series of unlawful acts in discriminating against Plaintiff with respect to compensation, terms, conditions, or privileges of employment in violation of the ADEA, 29 U.S.C. § 623(a).

59. Defendant's decision to terminate Plaintiff was induced by its intent to discriminate against Plaintiff on the basis of his age, as evidenced by the conduct described above.

60. Plaintiff has been directly harmed as a result of Defendant's violations as is fully set forth above.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Honorable Court will:

(a) Assume jurisdiction herein;

(b) Declare Defendant's conduct to be unlawful and an intentional violation of Plaintiff's rights;

(c) Award Plaintiff wage loss damages, including back pay, front pay, and lost future earnings, damages associated with the increased tax burden of any award, and lost fringe and other benefits of employment;

(d) Award Plaintiff liquidated damages under the ADEA;

(e) Award Plaintiff pre- and post-judgment interest;

(f) Award Plaintiff costs and attorneys' fees; and

(g) Grant such other relief as the Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Respectfully Submitted,

/s/ Nicholas W. Kennedy

Nicholas W. Kennedy
PA ID No. 317386

QuatriniRafferty
550 E. Pittsburgh St.
Greensburg, PA 15601